In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION MDL NO. 381.

Nos. 1085, 1095 and 1104, Dockets 85–6163, 85–6269 and 85–6337.

United States Court of Appeals, Second Circuit.

Argued April 9, 1986.

Decided April 21, 1987.

Robert A. Taylor, Jr. and Wayne M. Mansulla, Washington, D.C. (Ashcraft & Gerel, Washington, D.C., of counsel), for plaintiffs-appellants.

Richard J. Barnes, New York City (Townley & Updike, New York City, of counsel), for appellee Monsanto Co.

Cadwalader, Wickersham & Taft, New York City, for appellee Diamond Shamrock Chemicals Co.

Rivkin, Radler, Dunne & Bayh, Garden City, N.Y., for appellee Dow Chemical Co.

Kelley Drye & Warren, New York City, for appellee Hercules Inc.

Clark, Gagliardi & Miller, White Plains, N.Y., for appellee TH Agriculture & Nutrition Co., Inc.

Shea & Gould, New York City, for appellee Uniroyal, Inc.

Budd, Larner, Kent, Gross, Picillo, Rosenbaum, Greenberg & Sade, Short Hills, N.J., for appellee Thompson Chemicals Corp.

Before VAN GRAAFEILAND, WINTER, and MINER, Circuit Judges.

WINTER, Circuit Judge:

This opinion addresses the disposition of 287 appeals in cases brought by plaintiffs who chose to opt out of the Agent Orange class action. These cases remained in the

Eastern District of New York after the class settlement as a result of the multidistrict referral. Chief Judge Weinstein granted summary judgment against each of the optout plaintiffs, most of whom now appeal.[1] To avoid repetition, this opinion assumes familiarity with the discussion of the fairness of the settlement in the first of this series of opinions, 818 F.2d 145, and with Chief Judge Weinstein's opinions reported at: 597 F.Supp. 740, 775–99, 819–50 (E.D.N.Y.1984) ("*Settlement Opinion*"); 611 F.Supp. 1223 (E.D.N.Y.1985) ("*Opt-Out Opinion*"); and 611 F.Supp. 1267 (E.D.N.Y.1985) ("*Lilley Opinion*").

After they had settled with the class, the defendant chemical companies moved for summary judgment against the opt-out plaintiffs. Chief Judge Weinstein granted the motion on the alternative dispositive grounds that no opt-out plaintiff could prove that a particular ailment was caused by Agent Orange, *see Opt-Out Opinion,* 611 F.Supp. at 1260–63; *Lilley Opinion,* 611 F.Supp. at 1284–85, that no plaintiff could prove which defendant had manufactured the Agent Orange that allegedly caused his or her injury, *see Opt-Out Opinion,* 611 F.Supp. at 1263; *Lilley Opinion,* 611 F.Supp. at 1285, and that all the claims were barred by the military contractor defense. *See Opt-Out Opinion,* 611 F.Supp. at 1263–64; *Lilley Opinion,* 611 F.Supp. at 1285.

The district court's determination that individual causation could not be proven was based largely on its conclusion that the expert opinions submitted by the opt-out plaintiffs were inadmissible. Chief Judge Weinstein held that the opinions lacked a reliable basis and were therefore inadmissible under Fed.R.Evid. 703.[2] *See Opt-Out Opinion,* 611 F.Supp. at 1243–55; *Lilley Opinion,* 611 F.Supp. at 1280–83. He also found that the opinions were so unreliable that the danger of prejudice substantially outweighed their probative value under Fed.R.Evid. 403.[3] *See Opt-Out Opinion,* 611 F.Supp. at 1255–56; *Lilley Opinion,* 611 F.Supp. at 1283.

The district court's determination that no plaintiff could prove which defendant caused his or her particular illness was based on the undisputed facts that the amount of dioxin in Agent Orange varied according to its manufacturer and that the government often mixed the Agent Orange of different manufacturers and always stored the herbicide in unlabeled barrels. *See Opt-Out Opinion,* 611 F.Supp. at 1263 (citing *Settlement Opinion,* 597 F.Supp. at 816–44). The court also rejected *sub silentio* various theories of enterprise and alternative liability that it had discussed in evaluating the settlement. *See Settlement Opinion,* 597 F.Supp. at 820–28. We do not address either of these grounds for the grant of summary judgment because we affirm on the military contractor defense.[4]

The district court granted summary judgment on military contractor grounds because it found no genuine factual dispute as to whether the government possessed as much information as the chemical companies about possible hazards of Agent Orange at pertinent times. *See Opt-Out Opinion,* 611 F.Supp. at 1263. This information concerned an association between

---

1. The appellants include Anna M. Lilley, an opt-out plaintiff against whom summary judgment was granted in a separate opinion. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1267 (E.D.N.Y.1985) ("*Lilley Opinion*").

2. Fed.R.Evid. 703 provides:

   The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

3. Fed.R.Evid. 403 provides:

   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

4. Twenty-eight appellants made no evidentiary submission in response to the motion for summary judgment. We affirm those appeals on causation as well as military contractor grounds.

dioxin exposure and cases of chloracne and liver damage. We agree with the district court that the information possessed by the government at pertinent times was as great as, or greater than, that possessed by the chemical companies. We add a further reason for affirming the grant of summary judgment based on the military contractor defense. Even today, the weight of present scientific evidence does not establish that Agent Orange injured personnel in Vietnam, even with regard to chloracne and liver damage. The chemical companies therefore could not have breached a duty to inform the government of hazards years earlier.

Our consideration of the military contractor defense has been greatly impaired by the inexplicable and unjustifiable failure of the opt-outs' counsel to brief the issue even though it was a dispositive ground for the grant of summary judgment.[5] On appeal, their brief offers only the conclusory statement that "[t]he district court clearly committed error in holding that the government contract defense presented no genuine issues of material fact." We are then referred to 569 pages of deposition excerpts and documents, which are said to "raise clear questions of material fact."[6] No explanation is given of the relevance of these materials, however, and we are left in ignorance of appellants' view of the legal contours of the defense. Appellees, having no discussion to which they might respond, also do not address the issue.

■ We believe that federal law shields a contractor from liability for injuries caused by products ordered by the government for a distinctly military use, so long as it informs the government of known hazards or the information possessed by the government regarding those hazards is

equal to that possessed by the contractor. The military contractor defense has been the subject of several recent judicial decisions, *see Boyle v. United Technologies Corp.*, 792 F.2d 413, 414–15 (4th Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 872, 93 L.Ed.2d 827 (1987); *Tozer v. LTV Corp.*, 792 F.2d 403 (4th Cir.1986), *petition for cert. filed,* 55 U.S.L.W. 3337 (U.S. Oct. 23, 1986) (No. 86–674); *Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736 (11th Cir. 1985), *petition for cert. filed,* 54 U.S.L.W. 3632 (U.S. Mar. 17, 1986) (No. 85–1529); *Bynum v. FMC Corp.*, 770 F.2d 556 (5th Cir.1985); *Tillett v. J.I. Case Co.*, 756 F.2d 591, 596–600 (7th Cir.1985); *Koutsoubos v. Boeing Vertol,* 755 F.2d 352 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985); *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444 (9th Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984), and has figured prominently in the instant litigation, *see In re Diamond Shamrock Chemicals Co.*, 725 F.2d 858, 861 (2d Cir.), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984); *In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. at 847–50; 580 F.Supp. 690, 701–05 (E.D.N.Y. 1984); 565 F.Supp. 1263 (E.D.N.Y.1983); 534 F.Supp. 1046, 1053–58 (E.D.N.Y.1982); 506 F.Supp. 762, 792–96 (E.D.N.Y.1980). Our rationale for the defense is similar to that recently expressed by the Court of Appeals for the Fourth Circuit:

Traditionally, the government contractor defense shielded a contractor from liability when acting under the direction and authority of the United States. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20, 60 S.Ct. 413, 414, 84 L.Ed. 554 (1940). In its original form, the defense covered only construction projects,

---

**5.** Counsel have also failed to brief the second ground for granting summary judgment, the indeterminate defendant issue.

**6.** The opt-outs' brief states in a footnote:
Plaintiffs have placed in the appendix a number of documents and deposition excerpts which were submitted in opposition to defendants' motions for summary judgment [sic]. Those documents and deposition excerpts raise clear questions of material fact.

The Court's attention is respectfully commended to JA. 1717–24, 1759–1808, 2019–. 2356, 2392–2560, 2568–71. Plaintiffs regret that page constraints do not permit further comment on those documents. *See,* Master Class Action Brief, pp. 69–70.
We cannot agree that an editing of this 75–page brief, which can hardly be described as tightly written, would not have permitted a discussion of the military contractor issue.

*McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 448 (9th Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). Its application to military contractors, however, serves more than the historic purpose of not imposing liability on a contractor who has followed specifications required or approved by the United States government. It advances the separation of powers and safeguards the process of military procurement.

*Tozer*, 792 F.2d at 405.

■ Subjecting military contractors to full tort liability would inject the judicial branch into political and military decisions that are beyond its constitutional authority and institutional competence. *See Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973) ("The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.") (emphasis in original). The allocation of such decisions to other branches of government recognizes that military service, in peace as well as in war, is inherently more dangerous than civilian life. Civilian judges and juries are not competent to weigh the cost of injuries caused by a product against the cost of avoidance in lost military efficiency. Such judgments involve the nation's geopolitical goals and choices among particular tactics, the need for particular technologies resulting therefrom, and the likely tactics, intentions, and risk-averseness of potential enemies. Moreover, military goods may utilize advanced technology that has not been fully tested. *See McKay*, 704 F.2d at 449–50 ("in setting specifications for military equipment, the United States is required by the exigencies of our defense effort to push technology towards its limits and thereby to incur risks beyond those that would be acceptable for ordinary consumer goods"). Whereas judges and juries may demand extensive safety testing for goods marketed in the civilian sector, such testing could impose costs and delays inconsistent with military imperatives.

The procurement process would also be severely impaired if military contractors were exposed to liability for injuries arising from the military's use of their products. Military contractors produce goods for the government according to specifications provided by the government and for uses determined by the government. As long as the government is aware of known hazards, the decision to take the risk is made by the government, and it would be destructive of the procurement process and thereby detrimental to national security itself to hold manufacturers liable for injuries caused by the military's use of their products. Costs of procurement would escalate if contractors were exposed to liability. Contractors would find insurance difficult or impossible to procure, and bankruptcies might occur among companies supplying products essential to national security. Firms would take steps to avoid entering into government contracts, including resort to litigation. The effect on procurement would be particularly acute where claims of toxic exposure might be made and the number of potential claimants would be impossible to determine.

We also note that, absent the shield of the military contractor defense, the legal exposure of the contractor would be much greater than the exposure of a manufacturer that sells to a private corporation that uses its product. In the latter case, the user corporation will also be a defendant and bear some or all of the exposure. Under *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), however, the government cannot be sued and need not even cooperate with the contractor in defending personal injury litigation. Obtaining discovery from the government as a non-party might be difficult or even barred by a claim of national security privilege. The military contractor thus faces the great exposure of being the sole "deep pocket" available. In the instant matter, for example, the United States has avoided all claims against it and has refused to participate in settlement negotiations. Moreover, while the Veterans'

Administration ("VA") and the Congress have declined to recognize any ailments other than chloracne and porphyria cutanea tarda ("PCT"), a rare liver disorder, as related to Agent Orange exposure, *see infra*, the chemical companies found it prudent to pay $180 million notwithstanding the weakness of the plaintiffs' case.

At various stages in this litigation, Judge Pratt and Chief Judge Weinstein articulated somewhat different standards to govern the military contractor defense. Judge Pratt stated that each defendant would be required to prove the following elements:

1. That the government established the specifications for "Agent Orange";

2. That the "Agent Orange" manufactured by the defendant met the government's specifications in all material respects; and

3. That the government knew as much as or more than the defendant about the hazards to people that accompanied use of "Agent Orange".

*In re "Agent Orange" Product Liability Litigation,* 534 F.Supp. at 1055. In elaborating on the third element, Judge Pratt stated that a defendant could not employ the defense if it "was aware of hazards that might reasonably have affected the government's decision about the use of 'Agent Orange,' " *id.* at 1057, but failed to disclose them to the government. *Id.* at 1058.

After discovery and various motions, Judge Pratt concluded that disputes of material fact were involved in determining the third element—the relative knowledge possessed by the government and the chemical companies. *See In re "Agent Orange" Product Liability Litigation,* 565 F.Supp. at 1275. However, he concluded that all defendants were entitled to summary judgment with respect to the first two elements—that the government established the specifications for Agent Orange and that the Agent Orange manufactured by the defendants met these specifications in all material respects. *See id.* at 1274.

In approving the settlement, Chief Judge Weinstein addressed the military contractor defense as a potential bar to recovery by the plaintiffs. *See Settlement Opinion,* 597 F.Supp. at 843–50. While adopting the first two elements of the defense as defined by Judge Pratt, he modified the third element as follows:

A plaintiff would be required to prove, along with the other elements of his cause of action, that the hazards to him that accompanied use of Agent Orange were, or reasonably should have been known, to the defendant. The burden would then shift to each individual defendant to prove (1) that the government knew as much as or more than that defendant knew or reasonably should have known about the dangers of Agent Orange or (2), even if the government had had as much knowledge as that defendant should have had, it would have ordered production of Agent Orange in any event and would not have taken steps to reduce or eliminate the hazard.

*Id.* at 849. "In practical terms," Chief Judge Weinstein explained, this standard means "that a defendant would not be liable despite the fact that it negligently produced a defective product if it could show either that the government knew of the defect or that it would not have acted any differently even if it had known." *Id.* at 850.

We need not define the precise contours of the defense because we believe that under any formulation, and regardless of which party bears the burden of proof, the defendants here were entitled to summary judgment.

■ Agent Orange was a product whose use required a balancing of the risk to friendly personnel against potential military advantage. That balancing was the exclusive responsibility of military professionals and their civilian superiors. The responsibility of the chemical companies was solely to advise the government of hazards known to them of which the government was unaware so that the balancing of risk against advantage was informed.

■ Given the purpose of the duty to inform, a hazard that triggers this duty

must meet a two-pronged test. First, the existence of the hazard must be based on a substantial body of scientific evidence. A court addressing a motion for summary judgment based on the military contractor defense must thus look to the weight of scientific evidence in determining the existence of a hazard triggering the duty to inform. The hazard cannot be established by mere speculation or idiosyncratic opinion, even if that opinion is held by one who qualifies as an expert under Fed.R.Evid. 702. A military contractor is no more obligated to inform the government of speculative risks than it is entitled to claim speculative benefits. Second, the nature of the danger to friendly personnel created by the hazard must be serious enough to call for a weighing of the risk against the expected military benefits. Otherwise, the hazard would not be substantial enough to influence the military decision to use the product. Neither prong of the test is satisfied in the case of Agent Orange.

The use of Agent Orange in Vietnam was believed necessary to deny enemy forces the benefits of jungle concealment along transportation and power lines and near friendly base areas. Its success as a herbicide saved many, perhaps thousands of, lives. At the time of its use, both the government and the chemical companies possessed information indicating that dioxin posed some danger to humans. Indeed, there is evidence that the chemical companies feared that the presence of dioxin in Agent Orange might lead the government to restrict the sale of pesticides and herbicides in the civilian market. *See* P. Schuck, *Agent Orange on Trial* 85–86 (1986). However, the knowledge of the government and the chemical companies related to chloracne and certain forms of liver damage, ailments now known to be very rare among Vietnam veterans, and not to the numerous other ailments alleged in the instant litigation. Moreover, for the reasons stated in Chief Judge Weinstein's opinions, *see Opt-Out Opinion,* 611 F.Supp. at 1263; *Settlement Opinion,* 597 F.Supp. at 795–99, we agree that the critical mass of information about dioxin possessed by the government during the period of Agent Orange's use in Vietnam was as great as or greater than that possessed by the chemical companies. Nevertheless, the government continued to order and use Agent Orange. The second prong of the test is therefore not met.

Because of the paucity of scientific evidence that Agent Orange was in fact hazardous, the first prong also is not met. This is not a case in which a hazard is known to have existed in hindsight and the issue is whether the defendant had sufficient knowledge at an earlier time to trigger an obligation to inform. Rather, this is a case in which subsequent study indicates the absence of any substantial hazard and therefore negates any claim that the chemical companies breached a prior duty to inform.

When Agent Orange was being used in Vietnam, there was some evidence, possessed as we have said by both the government and the chemical companies, relating chloracne and liver damage to exposure to dioxin. Of course, the fact that dioxin may injure does not prove the same of Agent Orange, which contained only trace elements of dioxin. The precise hazard of the herbicide, if any, was thus a matter of speculation at the time of its use. Now, some 15 to 25 years after military personnel were exposed to Agent Orange, we have considerably more information about the effects of Agent Orange. As noted in our opinion upholding the settlement, 818 F.2d 145, and explained in greater detail in the district court's opinions approving the settlement, 597 F.Supp. at 787–95, and granting summary judgment against the opt-outs, 611 F.Supp. at 1231–34, epidemiological studies of those very personnel and their families fail to show that Agent Orange was hazardous, even with regard to chloracne and liver damage. While the decisions to use Agent Orange were being made, the most relevant question was not, "What will dioxin do to animals?" or even, "What will dioxin do to humans exposed to it in industrial accidents?" The most relevant question was, "What will Agent Orange do to friendly personnel exposed to it?" The epidemiological studies ask the latter question in hindsight and answer, "Nothing harmful so far as can be told." The fact that the

epidemiological studies do not exclude the possibility of harm in isolated or unusual cases or in future cases is of no moment because it does not constitute evidence material to the military decisions in question. Hardly any product of military usefulness is known to be absolutely risk free. Consequently, the existence of a hazard of which the government should have been informed remains unproven to this date, long after the relevant events. Indeed, although chloracne is a leading indicator of exposure to dioxin, it is very rare among Vietnam veterans. Accordingly, there never was information about material hazards that should have been imparted by the chemical companies to the government.

The military decision to use Agent Orange was, therefore, not ill-informed, much less ill-informed as a result of any action by the chemical companies. This conclusion is underscored by the actions of the VA and the Congress in addressing claims by veterans asserting injury by Agent Orange. The VA has recognized only chloracne and PCT as ailments related to Agent Orange. By May 1984, it had granted only 13 chloracne and two PCT claims. It later concluded that none of the 13 chloracne claims actually involved chloracne. *See Settlement Opinion,* 597 F.Supp. at 856 (citing remarks of Senator Cranston). In adopting the Veterans' Dioxin and Radiation Exposure Compensation Standards Act, Pub.L. No. 98–542, 98 Stat. 2725 (1984), Congress declined to compensate veterans claiming exposure to Agent Orange for ailments other than chloracne and PCT. It thus rejected earlier versions of the Act that would have compensated such veterans for other medical conditions, including soft tissue sarcomas and birth defects. *See* M. Gough, *Dioxin, Agent Orange* 225 (1986); *Settlement Opinion,* 597 F.Supp. at 855–57 (E.D.N.Y.1984) (discussing earlier legislation).

The VA and the Congress thus continue to act on the factual conclusion that Agent Orange was hazardous, if at all, only with regard to chloracne and PCT. We believe these actions further demonstrate that the military decision to use Agent Orange was fully informed. To hold the chemical companies liable in such circumstances would be unjust to them and would create a devastating precedent so far as military procurement is concerned.

Affirmed.