WM. T. THOMPSON COMPANY,
a Missouri Corporation

v.

The UNITED STATES.

No. 90–391C.

United States Claims Court.

April 22, 1992.

---

James S. Turner, Washington, D.C., attorney of record for plaintiff; Alan Dumoff, of counsel.

David S. Fishback, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant; Stephen M. Doyle and Burke M. Wong, of counsel.

## OPINION

YOCK, Judge.

This contractual dispute is before the Court on the parties' cross-motions for summary judgment, filed pursuant to USCC Rule 56.[1] For the reasons stated herein, the defendant's motion for summary judgment is granted, and the plaintiff's complaint will be dismissed.

### Facts

Plaintiff, Wm. T. Thompson Company (Thompson), was a manufacturer in the mid to late 1960's of a product known as Agent Orange, which was used for military pur-

---

1. Defendant has, in the alternative, moved to dismiss pursuant to USCC Rule 12.

poses by the United States Government as a defoliant during the Vietnam War. Years later, Vietnam veterans and their families, alleging that exposure to Agent Orange caused death, injuries, and birth defects, sued all the Agent Orange manufacturers, including Thompson. This multidistrict product liability tort suit was settled before trial, *In re "Agent Orange" Prod. Liab. Litig.* (hereinafter *"Settlement Opinion"*), 597 F.Supp. 740 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647, 648 (1988), and Thompson was required to pay $3,096,597.22 of the total settlement amount. The instant contract suit was brought by Thompson in an attempt to recover from the United States Government the costs it incurred in defending and settling the suit in the district court.

The following facts are essentially uncontroverted: Agent Orange is a mixture of two phenoxy herbicides, 2,4–Dichlorophenoxyacetic Acid (2,4–D), and 2,4,5–Trichlorophenoxyacetic Acid (2,4,5–T) in a 50/50 blend. Depending on the process utilized, when 2,4,5–T is produced, it may contain varying amounts of 2,3,7,8 Tetrachlorodibenzo-p-dioxin (dioxin), a toxic substance, although not a key ingredient of either Agent Orange or 2,4,5–T.[2]

As one court noted, "the government and the military had a considerable amount of knowledge about 2,4,5–T, about dioxin, and about the hazards associated with both." *In re "Agent Orange" Prod. Liab. Litig.* (hereinafter *"Agent Orange"*), 565 F.Supp. 1263, 1266 (E.D.N.Y.1983). This knowledge extended back into the 1950's, and the level of knowledge increased rapidly during the mid to late 1960's. Much of the Government's knowledge was classified and not shared with the chemical companies. *Id.* at 1267–68. However, some of

the bigger chemical companies that were producing Agent Orange for the military did develop a considerable amount of knowledge about the dangers associated with the production of 2,4,5–T and the dioxin contained therein during this same time frame.

Thompson began producing phenoxy herbicides that contained 2,4,5–T by itself, or in a mixture with 2,4–D, in the early 1950's and continued to market these herbicides in the early 1960's. In 1961, the Government began to use a variety of phenoxy herbicides in Southeast Asia to defoliate trees and plant life to eliminate possible hiding places for the Viet Cong and the North Vietnamese troops.[3]

As the Vietnam War progressed, the military needed greater amounts of Agent Orange, but Thompson declined to bid for the contracts. As summarized by another court, the Government was not deterred, and:

> Acting under appropriate statutory authority, The Defense Production Act of 1950, Sept. 8, 1950, ch. 932, 64 Stat. 798, amended, June 30, 1966, 80 Stat. 235 (current version at 50 U.S.C.App. §§ 2061 *et seq.*) however, the government required Thompson to supply Agent Orange pursuant to two contracts dated April 19, 1967 and May 24, 1968. It supplied 333,685 gallons between September 1967 and January 1969. As reflected in test results, the dioxin content of its product ranged from .1 to .3 [parts per million].

*Agent Orange*, 565 F.Supp. at 1272. The two contracts specified the formula for producing Agent Orange, and Thompson provided no input to the Government with respect to either the development or modification of the specifications, and the company strictly complied with the specifications. Regarding the possible hazards to users of

---

**2.** While it has not been proven scientifically or legally, the Vietnam veterans believed that exposure to Agent Orange caused cancer and birth defects, and these were allegedly caused by the dioxin present in this defoliant.

**3.** The defoliant Agent Orange and Thompson's commercial herbicides were of different concentrations and were applied differently. Agent

Orange contained roughly two to four times as much 2,4,5–T per gallon as most of the Thompson herbicides. Also, the Government used Agent Orange undiluted and sprayed at a rate of 3 gallons per acre, as compared to the dilution of Thompson's herbicide at a ratio of 100 to 1, sprayed at a rate of 1 gallon per acre.

Agent Orange, it appears that "the government's level of knowledge greatly exceeded that of Thompson in 1967." *Id.* at 1273. In March of 1967, the Government ordered Thompson to accelerate production of Agent Orange, and Thompson complied.[4] Thompson's total production was approximately two percent of all of the Agent Orange manufactured for use in Vietnam.

Some years later, starting in 1979, Vietnam veterans, or their estates, began filing negligence and strict liability tort actions against the chemical companies that produced Agent Orange for the Government. According to these plaintiffs, in view of the toxicity of dioxin, exposure to the Agent Orange that contained dioxin caused cancer, miscarriages, and birth defects. These actions were consolidated in the Eastern District of New York under the heading MDL No. 381.

On May 20, 1983, Thompson was granted summary judgment on its Government contractor defense, based upon the district court's finding that there was no evidence that Thompson had knowledge of hazards to users of Agent Orange and that the "government's level of knowledge greatly exceeded that of Thompson in 1967." *Agent Orange*, 565 F.Supp. at 1273. Unfortunately for Thompson, the granting of summary judgment was reversed by the succeeding district court judge approximately five months later, and Thompson was again made part of the litigation, along with all the other manufacturers of Agent Orange.

On May 7, 1984, the date trial was to begin, the parties reached a settlement, and a $180 million settlement fund was created. *Settlement Opinion*, 597 F.Supp. at 748. The district court judge, weighing the potential costs as well as the uncertainties associated with trial for both sides, found that the proposed settlement was fair, reasonable, and adequate. However, he did note that plaintiffs *had never* produced any persuasive evidence showing a causal

relationship between the exposure to small quantities of dioxin found in Agent Orange and the claimed injuries. *Id.*, 597 F.Supp. at 782–95. The district court's settlement opinion was affirmed, and the appeals court noted that it was "essentially a settlement at nuisance value," based on the "grave weaknesses in plaintiffs' case," since "the weight of present scientific evidence does not establish that personnel in Vietnam were injured by Agent Orange * * *." *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 171, 174 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988).

Thompson's share of the settlement was $3,096,597.22, which it paid into the settlement fund in June, 1984. According to Thompson, it also spent approximately $3 million in legal fees during the Agent Orange litigation.

Nearly 300 plaintiffs had previously opted out of the class action suit and thus were not bound by the May, 1984 settlement. Thompson and other Agent Orange manufacturers successfully moved for summary judgment against these remaining plaintiffs. *In re "Agent Orange" Prod. Liab. Litig.* (hereinafter *"Opt-out Opinion"*), 611 F.Supp. 1223 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 2899, 101 L.Ed.2d 932 (1988). The district court judge found that (1) plaintiffs failed to present credible evidence as to causation, and that (2) the plaintiffs' claims were barred by the Government contractor defense.[5] *Id.*, 611 F.Supp. at 1229, 1258–63. The appeals court affirmed, based upon the Government contractor defense, and also agreed that "the weight of present scientific evidence does not establish that Agent Orange injured personnel in Vietnam * * *." *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 187, 190 (2d Cir. 1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 2899, 101 L.Ed.2d 932 (1988).

---

**4.** Plaintiff alleges that the Government's method for accelerating production, increasing the temperature during processing, caused an increase in the amount of dioxin contamination.

**5.** The court also found that no individual plaintiff could prove which defendant chemical company had manufactured the Agent Orange to which he allegedly had been exposed.

The plaintiff filed its complaint with this Court on May 7, 1990 and amended it on October 23, 1990. According to Thompson, the Government breached its duty to disclose its superior knowledge regarding the health risks of Agent Orange. Additionally, Thompson submits that the Government violated its implied warranty that the Agent Orange it required Thompson to manufacture based on detailed specifications would be safe and free from defects. Finally, Thompson alleges that the Government breached an implied contractual duty to indemnify Thompson for losses arising from the Government's requirement that Thompson produce Agent Orange.[6] The Government filed a Motion To Dismiss or, in the Alternative, for Summary Judgment on November 20, 1990, seeking dismissal of the suit as a matter of law. Thompson filed a Cross–Motion for Summary Judgment on February 19, 1991, on the grounds that the law and the uncontested material facts dictate a finding that the United States Government is liable to Thompson.

### Discussion

■ "Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." *GAF Corp. v. United States*, 19 Cl.Ct. 490, 496 (1990), *aff'd*, 932 F.2d 947 (Fed.Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992). The substantive law involved in the suit determines which facts are material, and only disputes over material facts, those which might affect the outcome of the suit under the governing law, may properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts that are not relevant under the controlling law will not prevent the entry of summary judgment. *Id.* The moving party, in this case the defendant, has the burden of establishing that there are no genuine issues of material fact, *Celotex Corp. v. Catrett*, 477

U.S. 317, 321, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986), and that it is entitled to judgment as a matter of law. *GAF Corp.*, 19 Cl.Ct. at 496. For the following reasons, this Court finds that the Government has met its burden of establishing that there are no genuine material issues of fact in dispute and that it is entitled to judgment as a matter of law.

In its complaint, the plaintiff has alleged that it is entitled to reimbursement from the Government under three counts. All three counts are based on alleged breaches of implied-in-fact contract obligations. Plaintiff submits that it produced Agent Orange in the 1960's under written contracts with the Government that contained detailed design specifications developed solely by the Government. It contends further that it had no part in the development of the specifications, that it manufactured the Agent Orange to the exact specifications ordered by the Government, and that it had little, if any, knowledge about the potential hazards that were inherent in the product as produced and used by the Government. Given these factual circumstances, the plaintiff argues that it is entitled to indemnification in contract for the losses it incurred in defending against and settling the tort suits brought by the Vietnam veterans and their families against the manufacturers of Agent Orange. Thompson believes it is only equitable and fair that the Government assume the obligation and be allocated these risks because it ordered the production of Agent Orange to its own specifications, completely controlled the use (or misuse) of the product, and never shared any information about potential hazards in the product with the manufacturer. In short, if anyone was negligent here, it was the Government and the financial liability should, therefore, be borne by it and not by the innocent manufacturers of Agent Orange. The plaintiff, therefore, contends that it is entitled to be indemnified by the Government for the

---

6. While plaintiff's amended complaint included a constitutional taking claim, the defendant is correct in noting that, since plaintiff has made

no further mention of this claim, it must be considered abandoned. Thus, it will be dismissed.

costs it incurred under any one of three contractual theories.

The plaintiff's first theory involves the matter of the Government's alleged superior knowledge. Here, the plaintiff asserts that there was an implied-in-fact obligation on the part of the Government to reveal its *superior knowledge* concerning the nature and possible health risks of Agent Orange so as to not increase the plaintiff's cost of performance under the contract.

Second, the plaintiff alleges a warranty of specification theory. This theory is based upon an alleged Governmental breach of its implied-in-fact contractual obligation that the Agent Orange it required Thompson to manufacture would be safe and free from defects.

Third and finally, the plaintiff alleges that the Government was bound by an implied-in-fact contractual duty to indemnify Thompson for losses due to the Government's requirement that Thompson produce Agent Orange.

The defendant, for its part, opposes each one of the plaintiff's three breach of implied-in-fact contract arguments on factual as well as legal grounds. In addition, the defendant asserts that the rationale surrounding the Government contractor defense supplies an independent legal basis for finding in its favor.

After full consideration of the parties' briefs and oral arguments, it is evident to the Court that only the plaintiff's second claim regarding the warranty of specification has any potential vitality. The other two claims bear superficial resemblance to viable implied-in-fact contract theories, but, upon closer inspection, they do not meet the requirements established in the appropriate precedential case law. However, in the interest of completeness, this Court will discuss each of the plaintiff's three contractual claims and defendant's responses to them.

**A.** *Plaintiff's Implied–In–Fact Contract Claims.*

**1. Doctrine of Superior Knowledge**

█ There is a line of cases which allows Government contractors to recover from the Government the unexpected increased costs of performance of a contract if the Government, at the time the contract was formed, had superior knowledge regarding difficulties in production which were not apparent and were not otherwise known by the contractor. *American Ship Bldg. Co. v. United States*, 654 F.2d 75, 228 Ct.Cl. 220 (1981); *Hardeman–Monier–Hutcherson v. United States*, 458 F.2d 1364, 198 Ct.Cl. 472 (1972); *J.A. Jones Constr. Co. v. United States*, 390 F.2d 886, 182 Ct.Cl. 615 (1968); *Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 160 Ct.Cl. 437 (1963); *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46 (1983).

From this precedent, the plaintiff argues that the Government is liable to the manufacturers of Agent Orange for their costs in defending and settling the suits brought against them by Vietnam veterans. This is because the Government allegedly knew more about the hazards of dioxin contained in the Agent Orange than did the herbicide manufacturers, and the Government breached its duty (contractual obligation) to reveal this superior knowledge to the plaintiff.

The defendant counters that the plaintiff was an experienced manufacturer of 2,4,5–T through its commercial products. Also, it complied with the general reporting and registration requirements of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 135 *et seq.* (1964) (FIFRA).[7] In view of this, the Government could reasonably assume that the plaintiff had tested its products as required by FIFRA and would be aware of potential hazards associated with 2,4,5–T.

---

**7.** In addition to the general reporting and registration requirements imposed by FIFRA, 7 U.S.C. § 135a, the act also requires manufacturers to test products prior to marketing them. Specifically, 7 C.F.R. § 162.106 (1949) requires that the manufacturer have the product thoroughly tested by experimenters, and if it is "likely to cause injury to human beings, or desirable plants or animals, its limitations from these standpoints should be determined and adequate cautions placed on the label."

While the determination of how much knowledge both the plaintiff and the Government had about the hazards of dioxin and Agent Orange is fact-intensive and not suitable for summary judgment, this Court believes it is not necessary to reach a decision on this factual issue. In analyzing these cases, it is clear to this Court that the doctrine of superior knowledge covers *only* unexpected costs in the *performance* of the contract. None of the cases cited by the plaintiff involving the doctrine of superior knowledge extend the doctrine beyond the production of the item contracted for, be it disinfectant powder (*Helene Curtis*) or the construction of a dock in Australia (*Hardeman–Monier–Hutcherson*). In all of the cases cited above, the Government knew about some nonobvious obstacle that anyone would encounter in trying to produce the contracted-for item. For example, in *Helene Curtis*, it was a new substance that needed grinding in order to mix properly into the disinfectant powder, and, in *Hardeman–Monier–Hutcherson*, it was severe weather conditions and water currents that made the dock much more difficult to construct.

 The common thread is that, in all of these cases, the contractor had to spend more time or money on production than it anticipated when entering into the contract with the Government because of latent difficulties in the manufacturing or construction process. Also, the Government, at the time of contract formation, had knowledge of the latent problems that would raise performance costs and did not divulge this knowledge to the contractors. Thus, citing to *Helene Curtis*, the United States Court of Claims in *American Ship Bldg. Co.*, 228 Ct.Cl. at 225, 654 F.2d at 79, stated that the four factors of the superior knowledge doctrine were:

> [W]here (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government

failed to provide the relevant information.

To satisfy the requirements of the doctrine, the vital knowledge, which the Government possesses and the contractor does not, must be a fact that affects *performance costs* or *duration of performance*. In the case at hand, plaintiff does not claim that it had any unforseen problems in the manufacture of the Agent Orange which increased the costs of production or caused a delay in performance. Thus, the superior knowledge doctrine does not apply to plaintiff's claim and does not entitle it to recover costs that were not connected to actual *performance* under the contract, which was for the manufacture of the Agent Orange to the detailed Government specification. *See generally, Lopez v. A.C. & S., Inc.*, 858 F.2d 712, 717–18 (Fed.Cir.1988), *cert. denied*, 491 U.S. 904, 109 S.Ct. 3185, 3186, 105 L.Ed.2d 694 (1989). Prior case precedent simply does not allow the expansion of the doctrine of superior knowledge to be extended as far as the plaintiff apparently wants it to stretch. The time frame that the courts have found appropriate to review has always been the period of performance only—not some indefinite time stretching well into the future.

2. Warranty of Specification.

 In *United States v. Spearin*, 248 U.S. 132, 136–37, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918), the Supreme Court held that the inclusion of detailed specifications in a contract prepared by the Government imported a warranty that, if the specifications were followed, the resulting product would be adequate, and the contractor would not be responsible for the consequences of defects in the specifications. This implied warranty of specification has been recognized in many cases since *Spearin*. *See e.g., Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 609 F.2d 462 (1979); *Hol–Gar Mfg. Corp. v. United States*, 175 Ct.Cl. 518, 360 F.2d 634 (1966); *Blount Bros. Corp. v. United States*, 872 F.2d 1003 (Fed.Cir. 1989).

In *Spearin*, the defect became apparent due to damage that occurred during the

performance of the contract. *Spearin*, 248 U.S. at 134–35, 39 S.Ct. at 60–61. However, the warranty of specification is not limited to the time of performance, according to the holding in *Poorvu v. United States*, 190 Ct.Cl. 640, 420 F.2d 993 (1970). In that case, the defect in the specified construction method did not begin to manifest itself until some four years after the completion of the building, and the United States Court of Claims determined that the *Spearin* warranty of specification still operated to place the liability for the damage on the Government, which had dictated the construction specifications. *Poorvu*, 190 Ct.Cl. at 651, 420 F.2d at 1000.

Plaintiff argues that an implied-in-fact warranty of specification arose in this case because the Government supplied detailed specifications for Agent Orange to Thompson, and the plaintiff manufactured the defoliant in accordance with these detailed specifications. The warranty of specification means that the Government impliedly warranted that the item made to the precise specification would be safe and free from defects. Plaintiff claims that the Government breached this warranty because the plaintiff was subjected to tort suits by third parties who claimed they were injured by the Agent Orange the plaintiff manufactured.

The Government contends that plaintiff's claim is nearly identical to claims made by the asbestos manufacturers that, based on contract theories, attempted to recover from the United States costs they incurred as a result of suits brought by shipyard workers who were exposed to asbestos dust from using insulating products. The asbestos manufacturers made these products in accordance with military specifications and sold them to the United States during the World War II era and thereafter. Accordingly, the defendant relies on two asbestos-related cases, *Lopez* and *GAF Corp.*, for its defensive position. The Government contends that these cases bar the plaintiff's warranty of specification claim on the grounds that the factual circumstances of this case do not support finding an implied-in-fact agreement, a meeting of the minds, and this Court lacks

jurisdiction over contracts that are implied at law. *Lopez*, 858 F.2d at 714–15; *GAF Corp.*, 932 F.2d at 950.

For a warranty to be implied in fact, the plaintiff must demonstrate that "the circumstances strongly supported a factual inference that a warranty was implied." *Lopez*, 858 F.2d at 715. Such an inference arises only when the Government specifications told the contractor "just how to do the job," *id.* at 716, and not when they merely specified some certain characteristic in the contracted-for product. *GAF Corp.*, 932 F.2d at 950. With respect to the claims of breach of warranty of specification, the Court agrees with the plaintiff that the underlying bases of the decisions in *Lopez* and *GAF Corp.* were that the asbestos companies knew about the dangers of their products before entering into the contracts with the Government and that the products manufactured under the Government contracts did not differ materially from those already sold commercially. Thus, there was no basis for finding a factual inference that the specifications constituted an "extensive Government intrusion into the asbestos production process which might suggest that the Government intended to warrant the product's safety." *GAF Corp.*, 932 F.2d at 950.

Plaintiff argues that, in this case, there exists the extensive Government intrusion into the Agent Orange production process that suggests that the Government intended to warrant the product's safety. Also, the plaintiff alleges that it is unlike the asbestos manufacturers because it knew less than the Government did about the defoliant, and Agent Orange differed materially from the products plaintiff sold commercially.

However, even assuming that a warranty of specification arose from the Government's detailed specifications for Agent Orange, there must be more than the mere existence of a warranty to entitle the plaintiff to recover against the Government. Plaintiff must also show that this warranty was *breached* by the Government and that this breach caused plaintiff to suffer the type of damages recoverable in contract.

It is on these requirements, breach and contract damages, that the plaintiff has failed to state a case that can withstand the Government's summary judgment motion.

Turning again to *Spearin* and its progeny, the implied warranty of specification was breached when the product, made in accordance with the detailed specification created by the Government, was inadequate, and the inadequacy clearly caused some damage. In *Spearin*, the sewer was inadequate due to a problem with a blocked sewer pipe in the existing system; the new pipe broke, and the sewer overflowed and damaged the dry dock that the contractor was building for the Government. *Id.*, 248 U.S. at 134, 39 S.Ct. at 60. In *Poorvu*, the parking area for a building was constructed with inadequate support below it, in accordance with the Government's specifications. This caused the parking area to settle and put pressure on water pipes that were located beneath it. These pipes broke, and the water spilling from them saturated the ground under the building, which then weakened the support under the building, causing it to settle severely into the ground. *Id.*, 420 F.2d at 997, 190 Ct.Cl. at 646-47.

In these cases, it is clear that the specification was inadequate, and the resulting defect in the finished product caused obvious and direct damage. The courts in these cases appeared to analyze these situations by determining first, whether or not some damage had occurred, and second, whether or not the specification written by the Government was defective. If these two circumstances were present, the courts then determined which party should bear the risk of the faulty specification causing the damage. The implied warranty of specification is the method by which the court can allocate the risk of the faulty specification to the Government, which created the specification, rather than to the contractor, who actually built the defective item that caused the damage. *See* JOHN C. CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 199–202 (2d ed. 1985). As stated in *Spearin*, 248 U.S. at 136, 39 S.Ct. at 61, "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." Also, the court held in *Poorvu* that "the government must answer for damage incurred because of inadequate plans it has furnished." *Id.*, 420 F.2d at 1000, 190 Ct.Cl. at 651.

In this case, plaintiff asserts that the Government designed faulty specifications for Agent Orange because dioxin contaminated the specified defoliant product. The damage plaintiff claims as a result of the faulty specification is, however, the settlement costs it incurred when veterans claimed they were injured by the dioxin in the Agent Orange used for military purposes in Vietnam. Thus, the plaintiff claims that the Government breached the warranty by subjecting the chemical manufacturer to tort liability running to third parties who were injured by the Government's use of the Agent Orange manufactured by the plaintiff. However, for several reasons, the plaintiff cannot prove that it was actually subjected to tort liability by third parties because of its manufacture of Agent Orange for the Government's military use. First, dioxin has never been scientifically proven to cause the injuries that the veterans alleged, and second, the plaintiff was protected from liability to the veterans in any event under the Government contractor defense, which is discussed later in this opinion. Thus, to the extent that the warranty of specification does exist in this case, there has been no breach of the implied warranty of specification because the alleged defect in the herbicide has never been proven, and the plaintiff would not have been liable to third parties even if the specifications had been defective due to the Government contractor defense.

It is clear to this Court, after reviewing the many and varied decisions regarding the veterans' suits against the herbicide manufacturers, that Agent Orange and dioxin have never been proven to cause the injuries claimed by the veterans. As stated in the *Settlement Opinion*, "the result of an enormous scientific effort to be helpful on causation has, from the plaintiffs' point

of view, left the case at best open. This is not sufficient to support a recovery in tort law * * *." *Id.*, 597 F.Supp. at 795. Likewise, when the claims of the veterans who opted out of the class went forward after the settlement of the class action, the United States District Court for the Eastern District of New York granted summary judgment to the chemical manufacturers (including Thompson) and noted that "years of discovery and tens of millions of dollars spent by the government and others on research has not yielded any competent evidence indicating a genuine issue of fact about causation." *Opt-out Opinion,* 611 F.Supp. at 1260. Thus, plaintiff cannot show that it has been held liable to a third party for damages caused by a defect in the herbicide it produced for the Government under detailed specifications.

■ As for damages arising from contract breaches, it is axiomatic that such damages are limited to those that were reasonably foreseeable at the time the parties formed the contract. *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854). In *Northern Helex Co. v. United States,* 524 F.2d 707, 721, 207 Ct.Cl. 862, 888 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976), the court reviewed the rules governing damages for breach of contract and concluded that the authorities support denial of claims where "costs are too remote, speculative, and consequential to be compensable as damages." In this case, it is apparent that the costs (damages) plaintiff incurred by defending and settling a lawsuit brought by veterans, who were never able to prove that the plaintiff's product injured them, were not reasonably foreseeable at the time the contract was formed between the Government and the plaintiff.

■ Plaintiff urges that there is a strong judicial policy favoring settlements and the fact that it settled the underlying case, rather than litigating the issue of its liability to the veterans, should not count against plaintiff in its attempt to recover from the Government for breach of warranty. It is true that settlements are encouraged. *See e.g., Ahern v. Central Pac.*

*Freight Lines,* 846 F.2d 47, 48 (9th Cir. 1988); *Janneh v. GAF Corp.,* 887 F.2d 432, 435 (2d Cir.1989). However, the cases plaintiff cites regarding the recovery of settlements paid to third parties involve indemnification agreements, either implied-in-fact or implied-at-law. *Travelers Ins. Co. v. United States,* 493 F.2d 881 (3d Cir.1974); *Parfait v. Jahncke Serv., Inc.,* 484 F.2d 296 (5th Cir.1973), *cert. denied,* 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974). This Court does not have jurisdiction over contracts implied at law. *United States v. Mitchell,* 463 U.S. 206, 218, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983). As for an implied-in-fact contract, the factual circumstances do not support one because it simply was not foreseeable to the parties that the Agent Orange class action settlement would come to pass more than a decade after the contracts to supply the defoliant were formed. The facts may support an implied warranty of specification, but they cannot be stretched so far as to support the theory that the parties came to a meeting of the minds that there would be an indemnification agreement between them if the implied warranty of specification was alleged, but never proven, to be violated.

As for plaintiff's claim of attorney fees, the court in *Kania v. United States,* 650 F.2d 264, 269, 227 Ct.Cl. 458, 467, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981), noted that "jurisdiction to award counsel fees and other litigation expenses as an element of breach damages would be extremely dubious. It is the kind of consequential damages not normally awarded in contract breach cases." *Also see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Overall, "[c]ourts do not, in awarding breach damages, follow through the remote indirect consequences of the breach as distinguished from those directly in contemplation when the contract was made." *Kania,* 650 F.2d at 269, 227 Ct.Cl. at 467. Thus, plaintiff cannot support a contention that it suffered compensable damages to the amount of its legal fees and costs as a result of the Govern-

ment's alleged breach of the implied warranty of specification.

Finally, the question remains as to whether plaintiff could ever have been found liable to third parties, even if causation between Agent Orange and veterans' injuries had been proven. The Government contractor defense would certainly present a serious obstacle to a manufacturer's liability to military service personnel for defects in products made to Government specifications for military applications. *See Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988); *Stencel Aero Eng'g Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977); and *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). The Government contractor defense will be discussed more fully in a later section of this opinion, but its impact on any liability the plaintiff would have to third parties must be noted at this juncture. The plaintiff asserts, in its arguments involving superior knowledge, that it manufactured the product to detailed specifications and lacked the knowledge it alleges the Government had regarding the hazards of Agent Orange. If this is true, then the plaintiff would avoid liability to third parties based on the Government contractor defense. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518. The plaintiff had an absolute defense. Plaintiff was well aware of this strong defense before it agreed to settle the claims of the veterans because, in 1983, it was granted summary judgment in its favor on the basis of the Government contractor defense, *Agent Orange,* 565 F.Supp. at 1275, even though plaintiff was later brought back into the case. Thus, in addition to the reasons already discussed above, there was no breach of the warranty of specification based on the manufacturer's tort liability to third parties supposedly injured by the product because the manufacturer, under the circumstances alleged, was protected from liability by the Government contractor defense.

### 3. Contract Indemnification.

■ For contractual indemnification to exist and to be actionable in this Court, it must arise from an express or implied-in-fact contract term. As noted earlier, this Court has no jurisdiction over contracts or contract terms which are implied at law. *United States v. Mitchell,* 463 U.S. at 218, 103 S.Ct. at 2968. While there was no express indemnification term in the procurement contract, plaintiff claims there is an implied-in-fact contract indemnification term springing from section 2157 of the Defense Production Act of 1950, 50 U.S.C.App. § 2061 *et seq.* (1964) (DPA), and the fact that the Government compelled plaintiff to manufacture Agent Orange. Section 2157 of the DPA provided that:

> No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act * * *.

Based on this section, plaintiff argues that an implied-in-fact indemnification term arose in the procurement contract between the plaintiff and the Government in regard to its Agent Orange contracts.

Plaintiff and the other chemical manufacturers also raised section 2157 as a defense in the district court suit brought by the veterans. However, Chief Judge Weinstein explained that section 2157 of the DPA was enacted as a *quid pro quo* to 50 U.S.C.App. § 2071, which authorizes the President to require that performance of contracts under the DPA take priority over other contracts currently binding the manufacturer. *Settlement Opinion,* 597 F.Supp. at 844. Thus, the court concluded that,

> Logically, then, the protection afforded by section [2157] should correspond to the risk imposed, viz., the possible need for the contractor to break its contracts with third parties or the increased risk to employees or users posed by speeded-up production. Except in rare instances there is no logical connection between the compulsion of section [2071] and the risk of injuries to those using or exposed to the contractor's product; the risk is something that all government contractors have in common and is already taken

into account in the government contract defense.

*Id.* at 845.

This Court agrees with the district court and finds that the DPA does not create an implied-in-fact contract term which would indemnify the plaintiff for any tort suits brought by users of the product the plaintiff made for the Government under the DPA. Instead, section 2157 provides the Government contractor with a defense. This defense excuses the Government contractor's breach of its other, non-Government contracts which were adversely affected by the priority given to the Government's procurement demands under the DPA. *See e.g., Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 997 (5th Cir.1976). It does not create an indemnification agreement between the Government contractor and the Government to cover tort damages suffered by users of the product procured under the DPA. *Settlement Opinion*, 597 F.Supp. at 845.

However, even if this Court were to assume, which it does not, that such an implied-in-fact contract term arose from the dealings between the parties alone, the term itself could not operate to bind the Government. It is clear that the United States cannot be bound by a contract, or a term within a contract, into which its agents were without the legal authority to enter. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). This principal applies regardless of whether or not the contract is express or implied. *Sutton v. United States*, 256 U.S. 575, 580, 41 S.Ct. 563, 565, 65 L.Ed. 1099 (1921). However, the plaintiff cannot show that the agent of the Government had the authority to enter a binding indemnification agreement because, for indemnity to exist, there must be either a prior appropriation to cover the possible costs of indemnity and/or a statutory exception to this rule permitting such payments. *See Matter of:*

*Assumption by Government of Contractor Liability to Third Persons—Reconsideration*, 62 Comp.Gen. 361 (1983). This is because an unfunded or unexcepted indemnification term would violate the Anti–Deficiency Act, 31 U.S.C. § 1341 (1988), which bars a federal agency from entering into a contract for future payments in excess of an existing appropriation. The Anti–Deficiency Act states, in pertinent part, that officers or employees of the United States may not:

> (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; or
> (B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

31 U.S.C. § 1341 (1988).

Thus, in *California–Pacific Util. Co. v. United States*, 194 Ct.Cl. 703 (1971), the United States Court of Claims dismissed an indemnification claim brought by a utility company seeking to recover amounts paid in settlement to a federal employee injured by one of its electric poles. The Court stated that:

> The United States Supreme Court, the Court of Claims, and the Comptroller General have consistently held that absent an express provision in an appropriation for reimbursement adequate to make such payment, [the Anti–Deficiency Act] proscribes indemnification on the grounds that it would constitute the obligation of funds not yet appropriated.

*Id.,* 194 Ct.Cl. at 715.

In the present case, plaintiff presents no appropriation or statutory exemption [8] which would authorize indemnification in this case. Thus, even if an implied indemnification agreement existed, it would be unenforceable under the Anti–Deficiency Act. Therefore, the plaintiff has no grounds for recovery on any contractual indemnification theory.

---

**8.** As earlier stated, section 2157 of the DPA does not create a contractual indemnification agreement between Thompson and the Government, but only a defense. Such a defense is to be utilized by the Government contractor in the event the DPA contracts have placed the contractor in breach of its other non-Government contractual commitments.

After consideration of all of the plaintiff's contractual arguments, it is apparent that most of the theories plaintiff advanced do not apply to hold the Government liable for the amount paid in connection with the settlement of the class action suit. The warranty of specification might apply to the Government based on the detailed specification for the production of Agent Orange. However, plaintiff has failed to come forth with the required quantum of proof regarding the breach of this warranty and the contract damages flowing therefrom. Thus, the moving party is entitled to summary judgment because the nonmoving party, the plaintiff, has "failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552.

B. *The Government Contractor Defense*

 Even if this Court is in error when it finds no breach and no damages as a matter of law in this case, the plaintiff would still not be able to recover in this action because of the Government contractor defense. The defendant alleges that, regardless of the resolution of the contractual issues in this matter, the Government contractor defense provides a *separate* and *independent* basis for a denial of the plaintiff's claims. Based on the policies underlying the Government contractor defense, the defendant states that the plaintiff cannot be allowed to recover indirectly through this contract suit for reimbursement what the veterans could not recover directly against the Government under the Federal Tort Claims Act, 28 U.S.C. § 2671–80 (1988) (FTCA), i.e., tort damages from the Government payable to military personnel for injuries allegedly sustained while serving on active duty.

Plaintiff counters that the Government contractor defense was not settled law at the time of the settlement with the veterans in the class action suit, so there was the possibility that it might have been held liable to the veterans for billions of dollars. Thus, their decision to settle was very reasonable in the face of the possibility of massive liability. Also, the plaintiff asserts that the Government, in a brief it filed in the *Opt-out Opinion* in the district court action, argued against the application of the Government contractor defense to shield the herbicide manufacturers from liability, and thus the Government should be estopped from urging its application here.

While the Government contractor defense is certainly important to the resolution of the issues in this case, both parties have neglected to consider crucial matters in support of their respective arguments. What is primarily at issue in this case is the *Government's liability* to the plaintiff under these circumstances, not just the plaintiff's liability to the veterans. Fortunately, this issue has already been considered by the Supreme Court in *Stencel*, and this Court will follow its clear guidance in the instant case.

In *Stencel*, a serviceman, who was injured when the ejection system of his fighter aircraft malfunctioned, brought a product liability damage action against the manufacturer, Stencel, and the United States. Stencel cross-claimed against the Government for indemnity claiming that any malfunction in the system was due to faulty Government specifications and components. Based on the earlier *Feres* case, the Supreme Court upheld the district court's grant of summary judgment for both the Government and Stencel against the serviceman and also upheld the dismissal of Stencel's cross-claim against the Government.

In the *Feres* case, the Supreme Court held that an on-duty serviceman who is injured due to the negligence of Government officials may not recover against the United States under the FTCA. *Id.*, 340 U.S. at 146, 71 S.Ct. at 159. The Supreme Court in *Stencel* reviewed the *Feres* decision and concluded that it rested on three factors. First, the Supreme Court found that the relationship between the Government and its military personnel is distinctively federal in character, and, thus, it would not make sense to have the liability of the Government to an injured serviceman depend on the law of the place where

the injury occurred. Second, the Supreme Court determined that the statutory compensation scheme, which provides pensions and medical services to injured servicemen without regard to any negligence by the Government, stands as a legal substitute for allowing the Government to be sued in tort for negligence. Third and finally, the Supreme Court concluded that military discipline and the relationship between a soldier and his superiors, which has no counterpart in civilian affairs, might be distorted by the imposition of tort liability. *Stencel*, 431 U.S. at 671–72, 97 S.Ct. at 2057–58.

In the case of the contractor suing the Government, the Supreme Court determined that the same factors were relevant and that it must "consider the impact of these factors where, as here, the suit against the Government is not brought by the serviceman himself, but by a third party seeking indemnity for any damages it may be required to pay the serviceman." *Id.*, 431 U.S. at 672, 97 S.Ct. at 2058. The first factor, the application of federal rather than state law, and the third factor, the effect of tort liability on military discipline, operated with equal force in suits by the serviceman and suits by the contractor. *Id.*, 431 U.S. at 672–73, 97 S.Ct. at 2058–59. The second factor, the existence of the military compensation scheme, the Supreme Court found more difficult to apply in the case of the contractor suing to recover funds it had paid to the serviceman. However, it concluded that the compensation scheme served the dual purpose of providing an efficient remedy for the injured serviceman and also protected the Government through its limitation of liability provisions which provide an upper limit on the Government's liability for service-connected injuries. *Id.*, 431 U.S. at 673, 97 S.Ct. at 2058. Thus, in *Stencel*, 431 U.S. at 673, 97 S.Ct. at 2058, the Supreme Court determined that:

> To permit petitioner's claim would circumvent this limitation, thereby frustrating one of the essential features of the Veterans' Benefits Act. As we stated in a somewhat different context concerning the Tort Claims Act: "To permit [petitioner] to proceed ... here would be to

judicially admit at the back door that which has been legislatively turned away at the front door. We do not believe that the [Federal Tort Claims] Act permits such a result." [Citations omitted, alterations and omissions in original.]

Therefore, the contractor was not allowed to recover from the Government where the underlying claim for which the contractor was seeking indemnity was made by an injured serviceman. In conclusion, the Court observed that "[s]ince the relationship between the United States and [the contractor] is based on a commercial contract, there is no basis for a claim of unfairness in this result." *Id.*, 431 U.S. at 674, 97 S.Ct. at 2059.

The situation analyzed in *Stencel*, a contractor seeking indemnity from the United States for claims made by an injured serviceman, is analogous to plaintiff's claim in this case. Plaintiff in this action is seeking repayment from the Government of amounts it paid to injured military service personnel based on the Government's provision of specifications for the product which allegedly harmed the military service personnel. BLACK'S LAW DICTIONARY 769 (6th ed. 1990) defines indemnity as "reimbursement." Reimbursement of the amounts it paid in settlement and legal fees is what plaintiff requests here, and, thus, the strictures of the *Stencel* case apply and foreclose plaintiff's claim that the Government must reimburse it for its costs and fees in connection with the Agent Orange litigation. This suit by the plaintiff is a "back door" attempt to recover from the Government what the *Feres* doctrine blocked at the front door; that is, damages for injuries suffered by servicepersons in the line of duty. Accordingly, the rationale of *Stencel* requires this Court to deny the plaintiff's claim.

The reasoning of *Feres* and *Stencel* was later amplified and extended by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), which involved an action between private parties but implicated the Federal Government's interests. In *Boyle*, a United States Marine co-pilot was

killed when his helicopter crashed into the water during a training exercise. Although the Marine survived the impact, he was unable to escape from the submerged helicopter and drowned. Based on state tort law, the Marine co-pilot's estate sued the Government contractor that built the helicopter, claiming that the escape hatch was designed negligently because it opened outwards and was unusable when the helicopter was under water, due to the pressure of the water outside the submerged craft. The Government contractor (United Technologies) contended that it made the escape hatch to the precise specifications required by its contract with the Government and therefore was not liable under state tort law.

 Even though it was a state law tort suit between private parties, the Supreme Court found that "the Federal Government's interest in the procurement of equipment is implicated by suits such as the present one—even though the dispute is one between private parties." *Id.*, 487 U.S. at 506, 108 S.Ct. at 2515. Thus, federal law could possibly apply. However, for federal law to displace state tort law, there must be a significant conflict between a federal policy and the operation of the state tort law. *Id.*, at 507, 108 S.Ct. at 2515. Looking at the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80 (1988) (FTCA), the Supreme Court identified a provision that suggested the outlines of a significant conflict between federal interests and state tort law in the area of Government procurement. While the FTCA authorized suits against the Government for harm caused by the negligent or wrongful conduct of Government employees in certain circumstances, it specifically excepted from consent to suit any claims based on the exercise of a discretionary function by a federal agency or employee, 28 U.S.C. § 2680(a) (1988). *Boyle*, 487 U.S. at 511, 108 S.Ct. at 2518. The Court determined that:

> [T]he selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments * * * through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. [Citations omitted.]

*Id.* Thus, the state law, which would hold the Government contractor liable for design defects in military equipment, is displaced by the federal policy and law of deferring to military discretion in the procurement of military equipment embodied in the FTCA.

The Supreme Court in *Boyle* adopted a three-part test to determine when, to avoid conflict with the discretionary function exception, displacement of state law is appropriate. It stated:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.*, at 512, 108 S.Ct. at 2518. If the contractor satisfies this test, then it is not subject to tort liability under state law for defects in equipment it manufactured for the military in conformance with precise specifications provided by the Government. This is because such liability would infringe on the discretionary function exception to the FTCA by allowing a state court to second-guess indirectly the Government's judgment in the selection of the appropriate design for military equipment.

Relying on the Government contractor defense, the defendant argues here that the plaintiff's Tucker Act claim for contractual damages, just like a state court tort suit, is an attempt to have the judiciary second-guess the Government's decision to

procure and employ Agent Orange. The defendant claims that this flies in the face of the Government contractor defense and the discretionary function exception and that it does violence to the policy of Government discretion in military procurement which these doctrines protect. Thus, based on the policies underlying the Government contractor defense, the defendant contends that the plaintiff is barred from recovery on its Tucker Act claim.

The Government contractor defense is important to the instant case for two reasons. First, its underlying policies, as expressed in *Boyle*, are to protect the discretion of the Government in procuring military equipment, as mandated by the discretionary function exception to the FTCA. Therefore, this Court must determine whether these policies apply equally to suits by contractors against the Government as they do to suits by injured military personnel against the contractor, which *Boyle* addressed specifically. Second, this Court must consider whether the Government contractor defense operated in the suits plaintiff faced and provided plaintiff with such a strong defense that it is without grounds to claim that it was actually in grave danger of being held liable to third parties in tort for injuries stemming from the product it produced for the Government.

This Court agrees with the defendant's argument that the policies supporting the *Boyle* decision apply with equal force to an attempt by a Government contractor to sue the Government directly. The Supreme Court in *Boyle* was concerned with preserving the discretion of the military in choosing the appropriate design for military equipment because this choice involves balancing many conflicting considerations, including the trade-off between safety and combat effectiveness. *Id.*, at 511, 108 S.Ct. at 2518. This exact same discretion and balancing by the Government is implicated in the case at issue.

The Government procured Agent Orange to serve military needs in Vietnam. The product was designed and used to save American soldiers' lives by eliminating possible hiding places for the Viet Cong and North Vietnamese troops. Trade-offs between the effectiveness of Agent Orange and its safety were a necessary part of the Government's procurement and design activities. This Court agrees with Chief Judge Weinstein, who found that "[t]he information available makes it clear that the government would have concluded that the beneficial saving of American soldiers' lives by defoliating the Vietnamese jungles far outweighed any minimal risks to our own or allied troops posed by exposure to Agent Orange." *Opt-out Opinion*, 611 F.Supp. at 1263–64. As another court has noted, "[i]t is this sort of balancing which the *Boyle* defense protects, by providing for contractor immunity where state tort law would hold the contractors liable for injuries resulting from the government's design deficiencies." *In re Aircraft Crash Litig.*, 752 F.Supp. 1326, 1370 (S.D.Ohio 1990), *aff'd without op.*, 935 F.2d 269 (6th Cir.1991). Thus, this Court will heed the warning in *Boyle*, 487 U.S. at 511, 108 S.Ct. at 2518, and not second-guess military procurement decisions made by the Government in the guise of allowing the plaintiff contractor to recover from the Government payments made to injured service persons. Also, this Court will not restructure the United States' immunity and consent to tort suits, which are specified by the FTCA and its exception for discretionary functions, through the vehicle of a contract claim based on tort damages, especially in light of the expansion of immunity clearly manifested in *Boyle*. *Lopez*, 858 F.2d at 718.

Plaintiff argues that the Government contractor defense would not have applied to shield it from liability if the veterans' suit had not been settled because the unwanted dioxin which contaminated the Agent Orange was not a part of the Agent Orange policy considerations which are protected by the discretionary function exception. Plaintiff admits that the decision to use Agent Orange was a discretionary governmental decision but alleges that the use of design specifications which resulted in contamination was not a policy level determination protected by the discretionary

function exception. Plaintiff claims this type of parsing a decision into bits that are either discretionary or nondiscretionary is supported by the holding in *United States v. Gaubert,* ——— U.S. ———, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). However, it is clear that *Boyle* has already decided that the procurement of military equipment, when the United States Government approved reasonably precise specifications, is subject to the discretionary function exception. *Id.,* 487 U.S. at 512, 108 S.Ct. at 2518. This is the first prong of the *Boyle* test, and, along with the second prong, it assures that "the suit is within the area where the policy of the 'discretionary function' would be frustrated—*i.e.,* they assure that the design feature in question was considered by the Government officer, and not merely by the contractor itself." *Id.* Therefore, since *Boyle* clearly holds that the procurement of military equipment by the Government under reasonably precise specifications is a discretionary function, there is no need to apply the more general analysis of a discretionary function in *Gaubert.* Plaintiff has repeatedly urged that the Government created the precise specifications, that it followed these specifications exactly, and that it was unaware of any hazards which the Government may have known about. Thus, by plaintiff's own factual assertions, it is evident that the procurement of Agent Orange, even though contaminated by dioxin, was a discretionary function of the Government.

Plaintiff submits that *Boyle* was several years subsequent to the settlement in this case in 1984, and that, in 1984, the application of the Government contractor defense was, at best, uncertain. In effect, plaintiff argues that *Boyle* created a new doctrine and that it should not be applied retroactively. This raises the second reason for consideration of the Government contractor defense; namely, its availability to the plaintiff as a defense in the state tort suits it faced. The defendant contends that the plaintiff would never have been required to pay the veterans for their alleged injuries because, as a Government contractor, the plaintiff was completely protected by the Government contractor defense. The

Government notes that plaintiff was, in fact, granted summary judgment earlier against the opt-out claimants in view of the Government contractor defense in the district court. *Opt-out Opinion,* 611 F.Supp. at 1263–64. Also, the United States Court of Appeals for the Second Circuit affirmed on this basis, because "[s]ubjecting military contractors to full tort liability would inject the judicial branch into political and military decisions that are beyond its constitutional authority and constitutional competence." *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d at 191.

Plaintiff argues that it is unfair to retroactively apply *Boyle,* which was decided in 1988, to the issues plaintiff faced at the time of the settlement in 1984. However, this Court is not applying *Boyle* retroactively. The Government contractor defense existed long before *Boyle. See Yearsley v. W.A. Ross Constr. Co.,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940). Instead, using *Boyle* as a guide, this Court is applying the holdings of *Feres* (1950) and *Stencel* (1977), as discussed earlier, and the discretionary function exception to the FTCA, to the issues presented in this case. *Feres, Stencel,* and the FTCA were all operative at the time of the settlement in 1984 and would have barred a military contractor's tort liability to injured military service personnel. In fact, the defense was fully discussed by Judge Pratt in his 1983 decision, which granted the plaintiff's motion for summary judgment and allowed the plaintiff to be removed from the class action suit based on the operation of the Government contractor defense. *Agent Orange,* 565 F.Supp. at 1265. Thus, the later decision in *Boyle* did not chart a new course for Government contractors. It merely enunciated and clarified the Government contractor defense which already existed.

▮▮▮▮▮▮ As a final note, plaintiff also argues that the Government has taken inconsistent positions, by opposing the Government contractor defense in the district court and supporting it in this case. Plaintiff claims that the Government should be estopped from asserting a differ-

ent position in this case than it took in the earlier case in which it filed the brief. Under *Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), it is unlikely that estoppel will be found against the Government without a showing of fraud or affirmative misconduct by the Government. *Heckler v. Community Health Serv., Inc.*, 467 U.S. 51, 67, 104 S.Ct. 2218, 2227, 81 L.Ed.2d 42 (1984); *Schweiker v. Hansen*, 450 U.S. 785, 788–89, 101 S.Ct. 1468, 1470–71, 67 L.Ed.2d 685 (1981); *Jana, Inc. v. United States*, 936 F.2d 1265, 1270 (Fed. Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992); *Bolt v. United States*, 944 F.2d 603, 609 (9th Cir. 1991); *Portmann v. United States*, 674 F.2d 1155, 1164 (7th Cir.1982); *People's Bank & Trust Co. v. United States*, 7 Cl.Ct. 665, 668–69 (1985). No fraud has been shown or even alleged here, but plaintiff does claim affirmative misconduct on the part of the Government. However, even if plaintiff were able to meet the extremely stringent standard necessary to prove affirmative misconduct, *see e.g., Immigration & Naturalization Serv. v. Miranda*, 459 U.S. 14, 17–18, 103 S.Ct. 281, 282–83, 74 L.Ed.2d 12 (1982), plaintiff's estoppel argument still fails on more basic grounds. Even assuming that the Government is ever subject to estoppel, a party cannot prevail without at least showing that the traditional elements of estoppel are present. *Lyng v. Payne*, 476 U.S. 926, 935, 106 S.Ct. 2333, 2339, 90 L.Ed.2d 921 (1986). Plaintiff's claim does not meet the basic elements of traditional estoppel, which arises when "one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act" which changes his position for the worse. *Heckler v. Community Health Serv., Inc.*, 467 U.S. at 59, 104 S.Ct. at 2223 (quoting RESTATEMENT (SECOND) OF TORTS § 894(1) (1979)). In this case, the plaintiff did not *rely* on the assertions in the Government's brief either in its decision to settle or in its defense in the opt-out cases for which the brief was filed. The assertions in the

Government's brief did not affect the plaintiff's settlement decision because the brief in question was filed in another case on August 31, 1984, several months *after* the decision to settle was announced in the class action suit, which occurred on May 7, 1984. *Settlement Opinion*, 597 F.Supp. at 748. Also, in the opt-out cases, the plaintiff must have pressed the Government contractor defense regardless of the Government's brief because the plaintiff received summary judgment against the opt-out claimants based in part on the operation of the Government contractor defense. *Opt-out Opinion*, 611 F.Supp. at 1263. Thus, plaintiff cannot establish its reliance on the assertions of the Government, and so it fails to meet the traditional and basic requirements of estoppel.

In final summary, the plaintiff has failed to convince this Court that it can recover on any one of its implied-in-fact contract theories. Further, even if any one of its three contract theories could be found to be factually supportable, the plaintiff would still lose this lawsuit because of the application of the Government contractor defense to the undisputed facts.

## CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment is granted, and the complaint is to be dismissed.

No costs.